UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    - v. -

JOSEPH PERCOCO, a/k/a "Herb,"
ALAIN KALOYEROS, a/k/a "Dr. K.,"
PETER GALBRAITH KELLY, JR., a/k/a "Braith,"
STEVEN AIELLO,
JOSEPH GERARDI,
LOUIS CIMINELLI,
MICHAEL LAIPPLE, and
KEVIN SCHULER,

                Defendants.

No. S1 16 Cr. 776 (VEC)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
JOSEPH GERARDI'S AND STEVEN AIELLO'S MOTION TO DISMISS FOR
PROSECUTORIAL MISCONDUCT, SEVER, AND FOR A BILL OF
PARTICULARS**

**O'CONNELL & ARONOWITZ**

**Stephen R. Coffey**
**Scott W. Iseman**
54 State Street
Albany, NY 12207
(518) 462-5601

*Attorneys for Defendant Steven Aiello*

**WALDEN MACHT & HARAN LLP**

**Milton L. Williams**
One Battery Park Plaza
New York, NY 10004
(212) 335-2030

*Attorneys for Defendant Joseph Gerardi*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................ 1

SUMMARY OF THE ARGUMENT ............................................... 1

MOTION TO DISMISS THE INDICTMENT FOR PROSECUTORIAL MISCONDUCT

.............................................................................................................. 2

MOTION FOR A BILL OF PARTICULARS ................................... 6

ALLEGATIONS IN THE SUPERSEDING INDICTMENT ........................................... 6

    A.    Property of which Victims were Deprived ........................... 7

    B.    Official Acts ....................................................................... 8

    C.    Unnamed Co-conspirators and other Actors ...................... 9

    D.    Wire Communications ....................................................... 10

    E.    False statements to Federal Officers ................................. 10

LEGAL PRINCIPLES ........................................................................ 10

    A.    Property Deprivation .......................................................... 14

    B.    Official Acts ....................................................................... 15

    C.    Wire Communications ....................................................... 21

    D.    Unnamed Co-conspirators ................................................. 22

    E.    False Statements ................................................................. 24

MOTION FOR SEVERANCE ....................................................................... 27

    A.      Severance Under Rule 8 .................................................................... 29

    B.      The Two RFP Conspiracies ............................................................... 31

    C.      Percoco/Kelly Counts ....................................................................... 35

    D.      Severance Under Rule 14 .................................................................. 36

MOTION TO STRIKE SURPLUSAGE ....................................................... 39

MOTION TO DISMISS FOR PREINDICTMENT PREJUDICE ................... 42

    A.      Government's Media Strategy ........................................................... 43

    B.      Pretrial Prejudice as Standard Operating Procedure ......................... 47

FINAL MOTION ...................................................................................... 48

CONCLUSION ......................................................................................... 49

# TABLE OF AUTHORITIES

**Cases**

*Bank of Nova Scotia v. United States*,
   487 U.S. 250 (1988) ................................................................................................ 43

*Buckley v. Valeo*,
   424 U.S. 1 (1976) .................................................................................................... 41

*Fed. Election Com'n v. Wisconsin Right to Life*,
   551 U.S. 449 (2007) ................................................................................................ 41

*Ganek v. Leibowitz, et al*,
   No. 15-CV-1446 (S.D.N.Y. filed May 20, 2016) ...................................................... 47

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ................................................................................................ 19

*Kotteakos v. United States*,
   328 U.S. 750 (1946) ................................................................................................ 33

*Lauro v. Charles*,
   219 F.3d 202 (2d Cir. 2000) .................................................................................... 44

*McDonnell v. United States*,
   136 S. Ct. 2355 (2016) ............................................................................ 16, 17, 19, 20

*Ocasio v. United States*,
   136 S. Ct. 1423 (2016) ............................................................................................ 24

*Ognibene v. Parkes*,
   671 F.3d 174 (2d Cir. 2012) .................................................................................... 41

*United Stated v. Crocker,*
   568 F.2d 1049 (3rd Cir. 1977) .................................................................................. 3

*United States v. Ajemian*, No. 11–CR–1091(VM),
   2012 WL 6762011 (S.D.N.Y. Dec. 27, 2012) .......................................................... 22

*United States v. Alvarez,*
   No. 14-CR-00120 EMC (NC), 2014 WL 7240670 (N.D. Cal. Dec. 19, 2014) ............ 11

*United States v. Barnes,*
   158 F.3d 662 (2d Cir. 1998) .................................................................................... 12

*United States v. Berardi,*
   629 F.2d 723 (2d Cir. 1980) .................................................................................... 26

*United States v. Berger,*
224 F.3d 107 (2d Cir. 2000).................................................................... 31, 33

*United States v. Bin Laden,*
92 F. Supp. 2d 225 (S.D.N.Y. 2000)............................................. 13, 22, 25

*United States v. Binday,*
804 F.3d 558 (2d Cir. 2015)................................................................ 14, 15

*United States v. Bortnovsky,*
820 F.2d 572 (2d Cir. 1987)...................................................................... 11

*United States v. Burke,*
700 F.2d 70 (2d Cir. 1983)........................................................................ 42

*United States v. Burke,*
87 Cr. 0703(DNE), 1988 WL 6217 (S.D.N.Y. Jan. 7, 1988)...................... 25

*United States v. Butler,*
351 F. Supp. 2d 121 (S.D.N.Y. 2004)....................................................... 26

*United States v. Carey,*
152 F. Supp. 2d 415 (S.D.N.Y. 2001)....................................................... 25

*United States v. Carlo,*
507 F.3d 799 (2d Cir. 2007)...................................................................... 14

*United States v. Cervone,*
907 F.2d 332 (2d Cir.1990)....................................................................... 30

*United States v. Chalmers,*
410 F. Supp. 2d 278 (S.D.N.Y. 2006).................................................. 22, 23

*United States v. Columbo,*
No. 04-CR-273 (NRB), 2006 WL 2012511 (S.D.N.Y. Jul. 18, 2006) ......... 11

*United States v. Conyers,*
No. S13 15-CR-537 (VEC), 2016 WL 7189850 (S.D.N.Y. Dec. 9, 2016)....... 11, 31, 37

*United States v. Crisci,*
273 F.3d 235 (2d Cir. 2001)................................................................. 21, 27

*United States v. Daunhauer,*
No. CR-11-06-BLG-JDS, 2011 WL 13136822 (D. Mont. Oct. 5, 2011) ...... 11

*United States v. David,*
86 Cr. 454 (JFK), 1986 WL 13805 (S.D.N.Y. Nov. 21, 1986)..................... 25

*United States v. Davidoff*,
    845 F.2d 1151 (2d Cir. 1988)................................................................................. 11, 13

*United States v. Davis*, No. 06-CR-911 (LBS),
    2009 WL 637164 (S.D.N.Y. Mar. 11, 2009) ............................................................ 11

*United States v. Dellinger*,
    472 F.2d 340 (7th Cir. 1972) .................................................................................... 41

*United States v. Desena*,
    260 F.3d 150 (2d Cir. 2001)...................................................................................... 37

*United States v. Doherty*,
    867 F.2d 47 (1st Cir. 1989) ....................................................................................... 14

*United States v. Felder*,
    No. S2 14-CR-546 (VEC), 2016 WL 5852554 (S.D.N.Y. Oct. 5, 2016) ................... 31

*United States v. Feyrer*,
    333 F.3d 110 (2d Cir. 2003)............................................................... 29, 30, 37

*United States v. Forde*,
    699 F. Supp. 2d 637 (S.D.N.Y. 2010).................................................................. 36, 37

*United States v. Gabriel*,
    920 F. Supp. 498 (S.D.N.Y. 1996) .......................................................................... 28

*United States v. Ganim*,
    510 F.3d 134 (2d Cir. 2007)...................................................................................... 19

*United States v. Geddes*,
    Cr. No. 3-14-CR-228 (JBA), 2015 WL 1530800 (D.Conn. 2015) ............................ 31

*United States v. Gigante*,
    166 F.3d 75 (2d Cir. 1999)........................................................................................ 37

*United States v. Halper*,
    590 F.2d 422 (2d Cir.1978).................................................................................. 31, 35

*United States v. Heatley*,
    994 F. Supp. 483 (S.D.N.Y. 1998) .......................................................................... 11

*United States v. Herrera*,
    No. 90-CR-184 (CSH), 1990 WL 128921 (S.D.N.Y. Aug. 29, 1990)........................ 12

*United States v. Jacobs*,
    531 F.2d 87 (2d Cir. 1976)......................................................................................... 4

*United States v. Jacobs,*
   547 F.2d 772 (2d Cir. 1976)................................................................................ 4

*United States v. Johansen*,
   56 F.3d 347 (2d Cir. 1995)............................................................................... 33

*United States v. Kahale*,
   789 F. Supp. 2d 359 (E.D.N.Y. 2009) ......................................................... 23

*United States v. Kaplan*,
   No. 02-CR-883 (DAB), 2003 WL 22880914 (S.D.N.Y. 2003)............... 12, 25

United States v. Kemp,
   500 F.3d 257 (3d Cir. 2007)............................................................................ 19

*United States v. Laurent*,
   607 F.3d 895 (1st Cir. 2010).......................................................................... 13

*United States v. Lech*,
   161 F.R.D. 255 (S.D.N.Y. 1995) .................................................................. 32

*United States v. Lee*,
   833 F.3d 56, 69 (2d Cir. 2016)....................................................................... 20

*United States v. Lee*,
   No. 1:15-CR-445, 2016 WL 7336529 (N.D. Ohio Dec. 19, 2016) ............. 18

*United States v. Lino*,
   No. 00-CR-632 (WHP), 2001 WL 8356 (S.D.N.Y. 2001) .......................... 23

*United States v. Ma*,
   03-CR-734 (DAB), 2006 WL 708559 (S.D.N.Y Mar. 21, 2006) ................ 12

*United States v. Maldonado-Rivera*,
   922 F.2d 934 (2d Cir. 1990)...................................................................... 31, 34

*United States v. Matias*,
   No-89-CR-323 (SWK), 1989 WL 160222 (S.D.N.Y. Dec. 29, 1989)......... 12

*United States v. Menendez*,
   Cr. No. 15-155, 2015 WL 5703236 (D.N.J. 2015) ...................................... 48

*United States v. Minaya*,
   395 F. Supp. 2d 28 (S.D.N.Y. 2005)............................................................ 12

*United States v. Moten*,
   582 F.2d 654 (2d Cir. 1978).......................................................................... 48

*United States v. Mulder*,
273 F.3d 91 (2d Cir. 2001)........................................................................................ 40

*United States v. Murray*,
618 F.2d 892 (2d Cir.1980)...................................................................................... 21

*United States v. Nachamie*,
91 F. Supp. 2d 565 (S.D.N.Y. 2000)......................................................................... 23

*United States v. Nerlinger*,
862 F.2d 967 (2d Cir. 1988)..................................................................................... 31

*United States v. Ng Lap Seng*,
No. S5-15 CR-706 (VSB). (S.D.N.Y. Nov. 30, 2016), available at
http://globalinvestigationsreview.com/digital_assets/bdf79415-a793-49fa-858e-
2fe106481d0f/ng.pdf................................................................................................. 18

*United States v. O'Brien*,
994 F. Supp. 2d 167 (D. Mass 2014) ........................................................................ 14

*United States v. Ohle*,
678 F. Supp. 2d 215 (S.D.N.Y. 2010)....................................................................... 28

*United States v. Oruche*,
No. 07-CR-0124 (WHP), 2008 WL 612694 (S.D.N.Y. Mar. 5, 2008)........................ 23

*United States v. Otto*,
54 F.2d 277 (2d Cir. 1931)....................................................................................... 26

*United States v. Rajaratnam*,
736 F. Supp. 2d 683 (S.D.N.Y. 2010)....................................................................... 28

*United States v. Rajaratnam*,
No. 09-CR-1184 (RJH), 2010 WL 2788168 (S.D.N.Y. Jul. 2010) ....................... 13, 22

*United States v. Reale,*
No. S4 96-CR-1069 (DAB), 1997 WL 580778 [(S.D.N.Y. 1997) ............................. 22

*United States v. Resendiz-Ponce*,
549 U.S. 102 (2007)................................................................................................. 20

*United States v. Ring*,
706 F.3d 460 (D.C. Cir. 2013) ................................................................................. 40

*United States v. Rittweger*,
524 F.3d 171 (2d Cir. 2008)..................................................................................... 30

*United States v. Rosen*,
716 F.3d 691 (2d Cir. 2013)..........................................................................................19

*United States v. Rossomando*,
144 F.3d 197 (2d Cir.1998)............................................................................................14

*United States v. Ryland*,
806 F.2d 941 (9th Cir. 1986) .........................................................................................11

*United States v. Sakoc*,
115 F. Supp. 3d 475 (D. Vt. 2015).................................................................................25

*United States v. Sanders*,
211 F.3d 711 (2d Cir. 2000)...........................................................................................41

*United States v. Santiago*,
174 F. Supp. 2d 16 (S.D.N.Y.2001)..........................................................................36, 37

*United States v. Scarpa*,
913 F.2d 993 (2d Cir.1990)............................................................................................40

*United States v. Scully*,
108 F. Supp.3d 59 (E.D.N.Y. June 8, 2015) .................................................................22

*United States v. Shellef*,
507 F.3d 82 (2d Cir. 2007).......................................................................................15, 30

*United States v. Shteyman*,
No. 10-CR-347 (SJ), 2011 WL 2006291 (E.D.N.Y. May 23, 2011)............................23

*United States v. Silver*,
1:15-cr-00093-VEC (SDNY February 24, 2015), , Dkt. No. 12 ..................................47

*United States v. Silver*,
103 F. Supp. 3d 370 (S.D.N.Y. 2016)..............................................................42, 44, 47

*United States v. Silver*,
117 F. Supp. 3d 461 (S.D.N.Y. 2015)..............................................................21, 22, 40

*United States v. Silver*,
203 F. Supp. 3d 370 (S.D.N.Y. 2016)..................................................................16, 17

*United States v. Sivilla*,
714 F.3d 1168 (9th Cir. 2013) .......................................................................................13

*United States v. Solomonyan*,
451 F. Supp. 2d 626 (S.D.N.Y. 2006)......................................................................22, 23

*United States v. Sorich*,
  523 F.3d 702 (7th Cir. 2008) ...................................................................................... 14

*United States v. Strawberry,*
  892 F. Supp. 519 (S.D.N.Y. 1995) .............................................................................. 11

*United States v. Stringer*,
  730 F.3d 120 (2d Cir. 2013).................................................................................. 21, 26

*United States v. Sturdivant*,
  244 F.3d 71 (2d Cir. 2001)............................................................................................ 21

*United States v. Suarez*,
  Cr. No. 09-932 (JLL), 2010 WL 4226524, (D.N.J. 2010) ........................................... 13

*United States v. Tavares*,
  844 F.3d 46 (1st Cir. 2016)........................................................................................... 22

*United States v. Taylor*,
  25 F.R.D. 225 (E.D.N.Y.1960) .................................................................................... 12

*United States v. Tonelli*,
  577 F.2d 194 (3d Cir.1978)........................................................................................... 26

*United States v. Torres*,
  901 F.2d 205 (2d Cir. 1990).......................................................................................... 11

*United States v. Trie*,
  21 F. Supp. 2d 7 (D.D.C. 1998) .............................................................................. 25, 26

*United States v. Turoff*,
  853 F.2d 1037 (2d Cir. 1988)........................................................................................ 30

*United States v. Ulbricht*,
  No. 14-CR-68 (KBF), 2014 WL 5090039 (S.D.N.Y. 2014) ....................................... 41

*United States v. Verra*,
  203 F. Supp. 87 (S.D.N.Y. 1962) ................................................................................. 42

*United States v. Wallach*,
  935 F.2d 445 (2d Cir.1991)........................................................................................... 15

*United States v. Walters*,
  No. 16-CR-338 (PKC) (S.D.N.Y. filed May 16, 2016) ................................................ 47

*United States v. Wey*,
  No. 15-CR-611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017)............................ 31

*United States v. Whitfield,*
 590 F.3d 325 (5th Cir. 2009) ...................................................................... 19

*United States v. Yaron*,
 No. S2 10-CR-363 (GBD), 2011 WL 3279054 (S.D.N.Y. July 28, 2011).................. 32

**Statutes**

18 U.S.C § 1001 ................................................................................ 1, 4, 25

18 U.S.C § 666 ............................................................................................ 9

18 U.S.C. § 201(a)(3) ............................................................................ 16, 17

**Other Authorities**

US DEP'T OF JUSTICE, UNITED STATES ATTORNEYS' MANUAL, 9-11.150 (2012),
 *available at* http://www.usdoj.com ................................................................ 5

US DEP'T OF JUSTICE, UNITED STATES ATTORNEYS' MANUAL, 9-11.151 (2012),
 *available at* http://www.usdoj.com ............................................................. 3, 5

US DEP'T OF JUSTICE, UNITED STATES ATTORNEYS' MANUAL,
 9-11.152 (2012) ........................................................................................ 5

**Rules**

Federal Rule of Criminal Procedure 12 ......................................................... 20

Federal Rule of Criminal Procedure 14 ........................................... 1, 27, 36, 39

Federal Rule of Criminal Procedure 3 ........................................................... 43

Federal Rule of Criminal Procedure 7 ..................................................... 1, 6, 10

Federal Rule of Criminal Procedure 8 ................................................... passim

Federal Rule of Evidence 801…………………………………………………...............37

New York Rule of Professional Conduct 3.6 .................................................. 46

S.D.N.Y. Local Criminal Rule 23 ................................................................. 46

**Regulations**

28 Code of Federal Regulations § 50.2 .......................................................... 46

## PRELIMINARY STATEMENT

Defendants Steven Aiello and Joseph Gerardi respectfully move this Court to dismiss the Superseding Indictment for prosecutorial misconduct based on misrepresentations made to Defendants' counsel concerning their status as either a subject or a target in any ongoing investigation prior to them consenting to participate in a proffer session with the prosecutors. At the very least, the Defendants request a hearing to probe further into how and why this misrepresentation was made to them. Defendants also move for a Bill of Particulars pursuant to Federal Rule of Criminal Procedure 7(f), to allow them to understand critical aspects of the charges against them. Should the Government fail to provide that information, Aiello and Gerardi ask for the relevant charges to be dismissed for duplicity and legal insufficiency. Aiello and Gerardi also seek severance under Rules 8 and 14 of the counts against them from the counts against the Buffalo Defendants arising out of a separate bidding process and from the counts against Peter Gailbraith Kelly for a wholly unrelated alleged bribery scheme. Finally, Aiello and Gerardi seek dismissal of the Superseding Indictment for extremely prejudicial pre-indictment publicity, orchestrated by the Government that poisoned the environment in which the grand jury deliberated.

## SUMMARY OF THE ARGUMENT

The Government misled Gerardi and Aiello by informing their counsel that they were subjects, as opposed to targets, in an ongoing investigation in order to convince the Defendants to participate in a proffer session, shortly after which, Defendants' counsel was informed that they were always considered targets. The end result of this ruse was that the Defendants were charged with one count of 18 U.S.C. § 1001, and the Government

improperly gained a preview of their defense. The Government has also thrown together a host of underspecified and legally inadequate allegations and brought them against a diverse set of Defendants that ought not to be tried together. Much as the Government would like to profit from surprise, ambiguity, and from spillover prejudice, these are substantial defects that this Court must address at this pretrial stage. Should it fail to do so, Defendants will be subjected to a trial that will be defective from its very start.

## MOTION TO DISMISS THE INDICTMENT FOR PROSECUTORIAL MISCONDUCT

Months prior to their September 2016 arrest, Gerardi (see Exhibit A) and Aiello and Gerardi received Grand Jury subpoenas, dated April 29, 2016, to appear as witnesses in an ongoing investigation in the Southern District of New York. As set forth in the accompanying affidavit of Anthony Copani, who served as counsel for Aiello and Gerardi at the time, in response to the subpoenas–which were not accompanied by any "Target Letter" -- he specifically inquired of an Assistant United States Attorney ("AUSA") as to their status. He was informed by the AUSA that they were "subjects" of the investigation. (Exhibit B at ¶ 6.)

Based on AUSA's representation, and in response to a proposal by the AUSA that they appear for a proffer in lieu of appearing before the Grand Jury, Aiello and Gerardi voluntarily agreed to appear at the U.S. Attorney's Office pursuant to a Proffer Agreement. They would not have appeared for a proffer, nor would they have submitted to interview,

had Mr. Copani been informed that the Government already considered them targets rather than subjects of the investigation. (*Id*. at ¶ 15.)[1]

On June 21, 2016, federal investigators and prosecutors interviewed Aiello for approximately six hours, and interviewed Gerardi for between three and four hours. (*Id.* at ¶ 10.) From the tone of the interviews it became apparent to Copani by the end of the day that his clients had been treated more like targets than subjects of the investigation.

Shortly after the June 21, 2016 interviews, Copani spoke with the AUSA on the telephone and told her that he was surprised by the treatment the defendants had received during their proffers, given that she had said the Government viewed them merely as subjects of the investigation. (*Id*. at ¶ 12.) The AUSA responded that his clients had been targets all along, and claimed to have told him so prior to the defendants' proffers. Copani strongly disputed that claim, and ultimately the AUSA conceded that she "may have" told him prior to the proffers that his clients were subjects. Copani was shocked by this concession, as it had always been his understanding that a prosecutor may not mislead defense counsel when asked the status of a client, especially when that client has been subpoenaed to appear before a Grand Jury. (*Id.* at ¶ 13.) On or about July 6, 2016, well after their June 21, 2016 proffers, Defendants Aiello and Gerardi received formal notification that they were targets in an investigation. (*Id.* at ¶ 14; Ex. C.) On September 22, 2016, Defendants were arrested and charged in a Criminal Complaint. Included among

---

[1]    When considering whether a witness is a target, the "[t]he test as to whether a witness is a target of a grand jury investigation cannot be whether he 'necessarily' will be indicted, but whether according to an objective standard he could be indicted." *United Stated v. Crocker,* 568 F.2d 1049, 1054 (3rd Cir. 1977); *see also* US DEP'T OF JUSTICE, UNITED STATES ATTORNEYS' MANUAL, 9-11.151 (2012), *available at* http://www.usdoj.com.

the charges against them was a violation of 18 U.S.C. § 1001 based on allegations that they had made false statements during their proffers.

These extraordinary circumstances require an extraordinary remedy. In *United States v. Jacobs*, 531 F.2d 87 (2d Cir. 1976), the Second Circuit affirmed a district court's dismissal of a perjury charge brought against the defendant based on her testimony before a Grand Jury on the ground that the attorney who questioned her failed to advise her that she was a target of investigation. The district court concluded that the defendant's due process rights had been violated. The Second Circuit did not reach the constitutional issue, but relied instead on its broad supervisory powers. The Government appealed, and after a remand by the Supreme Court, the Second Circuit reaffirmed its earlier ruling. *United States v. Jacobs,* 547 F.2d 772, 773-774 (2d Cir. 1976) (commenting that "we abhor perjury, but the limited question is whether, in these particular circumstances, the prosecution was entitled to the luxury of a perjury count").

The Court should impose the same remedy here. Indeed, in this case, the misconduct is as egregious as in *Jacobs,* if not more, because Defendant in *Jacobs* had not been affirmatively misled by a prosecutor's statement. Here, the AUSA's statement that the defendants were only "subjects" caused them to submit to questioning that they would never have undergone had they known their true status.

It is important to note, in addition, that the AUSA appears to have failed to comply with the policy of the Department of Justice, as set forth in the United States Attorney's Manual ("USAM"). While Aiello and Gerardi were sent an Advice of Rights Form with their respective Grand Jury subpoenas, consistent with the guidelines set forth in the USAM, they were not sent a supplemental warning that their conduct was being

investigated for possible violation of federal criminal law. *See* US Dep't of Justice, United States Attorneys' Manual, 9-11.151 (2012), *available at* http://www.usdoj.com.[2] As indicated above, the defendants did not receive any formal notification that they were targets until weeks after they proffered.

Moreover, in or about August 2016, Aiello's counsel, Stephen Coffey ("Coffey") met with the AUSA, and Coffey informed the AUSA of the following: "When you present this to the Grand Jury, I would like to be advised, because my clients may wish to testify." The AUSA's response to this statement was "that is not your decision to make." According to US Attorney's Office guidelines "under normal circumstances, where no burden upon the grand jury or delay of its proceedings is involved, reasonable requests by a "subject" or "target" of an investigation, as defined above, to testify personally before the grand jury ordinarily should be given favorable consideration. *See* US Dep't of Justice, United States Attorneys' Manual, 9-11.152 (2012).

It is difficult to imagine that on a matter of such obvious importance to individuals in receipt of Federal Grand Jury subpoenas, and of equal importance to their counsel, a prosecutor would recklessly misrepresent their status. Regardless of whether the AUSA's statement was merely reckless, inadvertent, or intentional, however, a substantial sanction must be imposed to deter such conduct in the future, both by this prosecutor and by other prosecutors throughout the United States Attorney's Office. The appropriate sanction, at a minimum, is dismissal of Count Fifteen. In any event, the Court should order a hearing to determine the totality of the circumstances surrounding this misrepresentation, including

---

[2] In addition, the AUSA may well have failed to comply with DOJ policy requiring that before she issue a Grand jury subpoena to a target, she secure the approval of the United States Attorney. *See* US Dep't of Justice, United States Attorneys' Manual, 9-11.150 (2012), *available at* http://www.usdoj.com.

whether it was intentional, and if so, whether it was made for some improper purpose, such as seeking to gather information about any possible defense before seeking an indictment of these two Defendants.

## <u>MOTION FOR A BILL OF PARTICULARS</u>

Having unsuccessfully sought assistance from the Government in this regard, Defendants respectfully move this Court pursuant to Federal Rule of Criminal Procedure 7(f) for an Order requiring the Government to file a Bill of Particulars concerning several critical pieces of information that they need in order to understand the nature of the charges against them and to prepare a defense thereto.  As set forth herein, neither the language of the Superseding Indictment nor the discovery in this case are sufficiently clear as to the property of which victims of the alleged bid-rigging scheme were deprived; the official acts implicated in the alleged quid pro quos; the wire communications made in furtherance of the alleged frauds; the identities of the alleged co-conspirators; and the particular statements that the Government intends to prove are "materially false, fictitious, and fraudulent."

Should the Government refuse to pin itself down on these critical charging points and seek advantage from these strategic and highly prejudicial ambiguities, Defendants alternatively move for dismissal of the relevant charges for duplicity.

## <u>ALLEGATIONS IN THE SUPERSEDING INDICTMENT</u>

While the "Overview" section of the Superseding Indictment, ¶¶ 1-36, sketches out, with varying specificity, a variety of wide-ranging schemes, the operative charging

language in the specific counts against Aiello and Gerardi have a studied vagueness suggesting a desire by the Government to gain some sort of strategic advantage. This is particularly true with respect to the property of which victims of the alleged bid-rigging scheme were deprived; the official acts implicated in the alleged quid pro quos; the wire communications made in furtherance of the alleged frauds; the identities of the alleged co-conspirators; and the particular statements that the government intends to prove are "materially false, fictitious, and fraudulent."

## A.  Property of which Victims were Deprived

Count One, a conspiracy count, charges a "scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses," "to wit . . .  a scheme to defraud Fort Schuyler in its award of significant taxpayer-funded development contracts by representing to Fort Schuyler that the bidding processes for those contracts were fair, open, and competitive, when, in truth and in fact, KALOYEROS and Todd Howe, in collaboration and in concert with AIELLO, GERARDI, CIMINELLI, LAIPPLE, and SCHULER, used their official positions to secretly tailor the requests for proposals ("RFPs") for those contracts so that companies that were owned, controlled, and managed by [Defendants] would be favored to win in the selection process for the contracts, and did transmit and cause to be transmitted interstate email and telephonic communications in furtherance of their scheme to defraud." (Ind. ¶ 39).

Count Two similarly charges that Defendants "devised a scheme to defraud Fort Schuyler in its award of the Syracuse RFP by representing to Fort Schuyler that the bidding process for the Syracuse Preferred Developer contract was fair, open, and competitive,

when, in truth and in fact, KALOYEROS and Todd Howe, in collaboration and in concert with AIELLO and GERARDI, used their official positions to secretly tailor the RFP for the contract so that the Syracuse Developer, which was owned, controlled, and managed by AIELLO and GERARDI, would be favored to win in the selection process for the contracts, and did transmit and cause to be transmitted interstate email and telephonic communications in furtherance of their scheme to defraud." (Ind. ¶ 41). Count Four makes similar allegations as to other Defendants. As presently drafted, both Counts One and Two fail to adequately advise a sufficient property deprivation to constitute wire fraud.

## B. Official Acts

The Superseding Indictment's Overview alleges that, in exchange for the bribe payments that Aiello and Gerardi paid Percoco, Percoco agreed to take "official actions for the benefit of the Syracuse Developer as the opportunity arose." (Ind. ¶ 35). These official actions are alleged to have included that: (1) Percoco "exerted pressure on and provided advice to certain other State officials, with the intent that those officials reverse an adverse decision by the Empire State Development Corporation that would have required the Syracuse Developer to enter into a costly agreement with labor unions"; (2) Percoco "exerted pressure and provided advice to other State officials, with the intent that those officials secure the release of millions of dollars in State funds that had been allocated to the Syracuse Developer"; and (3) Percoco "exerted pressure on and provided advice to other State officials, with the intent that those officials secure a raise for" Aiello's son. (Ind. ¶ 35).

Count Three charges that Aiello and Gerardi "paid bribes to Todd Howe in exchange for, to influence, and to reward the taking of official action in his capacity as an agent and representative of SUNY Poly," in violation of 18 U.S.C § 666(a)(2). (Ind. ¶ 43).

Count Ten charges defendants with honest services fraud, alleging that Percoco "would take official action in exchange for bribes paid at the direction of AIELLO and GERARDI." (Ind. ¶ 59).

Count Fourteen charges Aiello and Gerardi with paying Percoco "in exchange for, to influence, and to reward the taking of official action to benefit the Syracuse Developer, including official action to advance its development projects in the State." (Ind. ¶ 67). As drafted Counts Three, Ten, and Fourteen fail to sufficiently identify the official action at issue.

## C. Unnamed Co-conspirators and other Actors

The Overview is not the only place where the Superseding Indictment alludes to other actors, perhaps, but not necessarily, culpable, who figure in the charged criminal schemes. Nowhere in the Overview does the Government identify the "other State officials" referred to in ¶ 35 of the Superseding Indictment.

Count One charges Aiello and Gerardi, other named Defendants, "and others known and unknown" with a wire fraud conspiracy. (Ind. ¶¶ 38, 39).

Count Six charges that Percoco "and others known and unknown" conspired to commit extortion "by obtaining cash payments from the Energy Company and the Syracuse Developer, with their consent, such consent having been induced under color of official

right." (Ind. ¶ 49). Count Eight charges only Percoco with extorting the Syracuse Developer "under color of official right." (Ind. ¶ 53).

## D. Wire Communications

Counts One, Two, and Ten each allege that for the purpose of executing two different wire fraud schemes and conspiracies, Defendants made certain wire transmissions in interstate and foreign commerce. At no point does the Superseding Indictment specify the particular wire transmissions the Government intends to use to establish each of these allegations.

## E. False statements to Federal Officers

Count Fifteen charges that, while meeting with federal agents and representatives of the U.S. Attorney's Office for the Southern District of New York, Aiello and Gerardi "each separately made statements denying involvement in paying [Percoco], and in tailoring the Syracuse RFP for the benefit of their company." (Ind. ¶ 69). The Superseding Indictment, however, does not state the particular statements from the meeting that the Government intends to prove were "materially false, fictitious, and fraudulent." (Ind. ¶ 69).

## LEGAL PRINCIPLES

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a Bill of Particulars in order to (1) identify with sufficient particularity the nature of the charges pending against him, thereby enabling him to prepare for trial; (2) prevent surprise; and (3) interpose a claim of double jeopardy should he be prosecuted a second time for the

same offense.  *See United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987); *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988).

To obtain a Bill of Particulars, a defendant must show that "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Torres,* 901 F.2d 205, 234 (2d Cir. 1990) (quotation marks and citation omitted); *United States v. Conyers*, No. S13 15-CR-537 (VEC), 2016 WL 7189850 at *7 (S.D.N.Y. Dec. 9, 2016) (quotation marks and citation omitted).  A Bill of Particulars is not intended to function as an investigative tool for the defense, and requests seeking evidentiary detail or a preview of the government's legal theories must be denied. *See, e.g., United States v. Columbo,* No. 04-CR-273 (NRB), 2006 WL 2012511 (S.D.N.Y. Jul. 18, 2006)*, United States v. Heatley,* 994 F. Supp. 483, 488 (S.D.N.Y. 1998); *United States v. Strawberry,* 892 F. Supp. 519, 526 (S.D.N.Y. 1995).

Still, even though a defendant is "not entitled to know all of the evidence the government intends to produce," some identification of its theory is required. *United States v. Daunhauer,* No. CR-11-06-BLG-JDS, 2011 WL 13136822, at *2 (D. Mont. Oct. 5, 2011); *see United States v. Ryland,* 806 F.2d 941, 942 (9th Cir. 1986) ("[a] defendant is not entitled to know all the *evidence* the government intends to produce but only the *theory* of the government's case") (emphasis in original); *United States v. Alvarez*, No. 14-CR-00120 EMC (NC), 2014 WL 7240670 (N.D. Cal. Dec. 19, 2014); *see also United States v. Davis*, No. 06-CR-911 (LBS), 2009 WL 637164, at *13 (S.D.N.Y. Mar. 11, 2009) (court denies bill of particulars motion where it "cannot say that the offenses charged or the theory of prosecution is so obscure that [defendants] will be hindered in preparing their defenses").  Indeed, "a bill of particulars will be required even if the effect is disclosure of

the Government's evidence or theories, if necessary to give the defendant enough information about the charge to prepare his defense." *United States v. Kaplan*, No. 02-CR-883 (DAB), 2003 WL 22880914, at *13 (S.D.N.Y. 2003) (citing *United States v. Barnes,* 158 F.3d 662, 665 (2d Cir. 1998)).

This is not a situation where the defendant is seeking more information about the "wheres, whens, and with whoms" of the crime. *United States v. Ma*, 03-CR-734 (DAB), 2006 WL 708559 (S.D.N.Y Mar. 21, 2006). Rather Defendants seek to know precisely what crimes they are charged with. *See United States v. Minaya*, 395 F. Supp. 2d 28 (S.D.N.Y. 2005) (requiring the Government to specify whether charged firearm possession was actual or constructive); *see also United States v. Herrera*, No. 90-CR-184 (CSH), 1990 WL 128921, at *3 (S.D.N.Y. Aug. 29, 1990) (Government voluntarily informed defendant that it intended to prove constructive rather than actual possession of narcotics after defendant requested that information in a bill of particulars.); *United States v. Matias*, No-89-CR-323 (SWK), 1989 WL 160222, at *5 (S.D.N.Y. Dec. 29, 1989) (Government ordered to disclose in a bill of particulars whether the defendant was charged with actual or constructive possession of cocaine and heroin); *United States v. Taylor*, 25 F.R.D. 225, 227 (E.D.N.Y.1960) (court granted request for bill of particulars specifying whether defendant was charged with actual or constructive possession of narcotics based on the Government's consent to provide that information).

While the Government will doubtlessly point to the mere volume of discovery it has already provided, "the production of this material does not necessarily obviate the need for a bill of particulars. The government may not 'rely solely on the quantity of information disclosed'; 'sometimes, the large volume of material disclosed is precisely what

necessitates a bill of particulars.'" *United States v. Rajaratnam*, No. 09-CR-1184 (RJH), 2010 WL 2788168, at *2 (S.D.N.Y. Jul. 2010) (quoting *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000); *see Davidoff,* 845 F.2d at 1154–55.

Moreover, even with respect to the discovery the Government has provided, sheer volume is no substitute for adequacy. The Government has indeed turned over approximately 1,371,570 documents, and 707,738 (51.6%) of these documents are emails. Yet, over four thousand two hundred and ninety-four (4,294) of these emails have no message content (and no corresponding email for each one of them can be located), which appears to be the result of data mishandling. In due course, Defendants will likely be seeking a spoliation instruction, as is appropriate "where there is evidence from which a reasonable jury might conclude that evidence favorable to one side was destroyed by the other." *United States v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010); *see also United States v. Sivilla*, 714 F.3d 1168, 1173 (9th Cir. 2013); *United States v. Suarez*, Cr. No. 09-932 (JLL), 2010 WL 4226524, (D.N.J. 2010). For now, however, given the possibly misleadingly incomplete nature of its production, the Government ought not to be able to rely on the sheer volume of the data.

Nor should the Government be permitted to escape its obligation to supply particulars by pointing at the Complaint in this case -- or even a part of it. While submitted in support of the charges set out therein, the Affidavit of Criminal Investigator Deleassa Penland entails a wide-ranging description of her investigative findings, not an authoritative clarification of the counts on which the government seeks to convict Aiello and Gerardi. However aggrieved as a practical matter, a Defendant cannot easily claim prejudice when the Government's proof deviates from an agent's allegations (often based

on hearsay), particularly when the Government has not formally adopted them. Yet for precisely that reason, the Government is obliged to specifically apprise Defendants of the charges against them, and not allude to a document that may or may not convey what the trial will be about and on what bases the Government will urge their conviction.

## A. Property Deprivation

"It is well-settled that a scheme to obtain jobs or promotions to persons who are not qualified, or not the most qualified, can constitute a scheme to obtain money or property under the mail fraud statute." *United States v. O'Brien*, 994 F. Supp. 2d 167, 182 (D. Mass 2014); *see also United States v. Doherty,* 867 F.2d 47, 55–56 (1st Cir. 1989)); *United States v. Sorich,* 523 F.3d 702, 712–13 (7th Cir. 2008). "'Since a defining feature of most property is the right to control the asset in question,'" this Circuit has also "recognized that the property interests protected by the [mail and wire fraud] statutes include the interest of a victim in controlling his or her own assets." *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (quoting *United States v. Carlo,* 507 F.3d 799, 802 (2d Cir. 2007) (quotation marks omitted). It has thus "held that a cognizable harm occurs where the defendant's scheme 'den[ies] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions.'" *Binday*, 804 F.3d at 570 (quoting *United States v. Rossomando,* 144 F.3d 197, 201 n. 5 (2d Cir.1998)).

Yet the Circuit has gone on to note:

It is not sufficient, however, to show merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations. The "right to control one's assets" does not render every transaction induced by deceit actionable under the mail and wire fraud statutes.

14

Rather, the deceit must deprive the victim "of potentially valuable economic information." *United States v. Wallach,* 935 F.2d 445, 463 (2d Cir.1991). "Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid -- which do not violate the mail or wire fraud statutes -- and schemes that depend for their completion on a misrepresentation of an essential element of the bargain -- which do violate the mail and wire fraud statutes." *United States v. Shellef,* 507 F.3d 82, 108 (2d Cir. 2007).

Thus, we have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain.

*Binday*, 804 F.3d at 570.

In this case, Defendants are left without notice of what specific property was allegedly deprived. So what is the "property," tangible or intangible, of which Fort Schuyler was deprived? Was it some lesser performance by the bidders here? Was it valuable information that Fort Schuyler needed to control its assets? Is it alleged that Gerardi and Aiello circumvented the control of assets, that being the "preferred developer" in the RFP process? Or are the relevant assets those that were to be deployed in the particular projects that Gerardi and Aiello's firm would be seeking contracts for later on? The Superseding Indictment gives no indication. Here again, the Government can be expected to argue that the answers to these questions lie somewhere in the voluminous discovery or can be teased out of the Complaint or the Superseding Indictment's "Overview." Not only is this not the case, but even if it were, the Government's efforts to hide the "property" are fair neither to Defendants nor the Court. In time, Defendants will be urging the Court to give jury instructions that ensure clarity on the nature of the property deprivation. For now, we urge the Court to require the Government to specify what it intends to prove in that regard.

**B. Official Acts**

The Government's studied effort to use generic charging language in situations where specificity is necessary to understanding the charges -- both for notice and for double jeopardy purposes -- finds a parallel in its approach to the bribery and extortion charges in this case.

As this Court explained in *United States v. Silver*, 203 F. Supp. 3d 370 (S.D.N.Y. 2016), "honest services fraud and extortion under color of official right require a quid pro quo -- an exchange of official action for something of value or property not due to the public official by his public office." *Id*. at 377. This Court also noted that the Supreme Court in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), had recently addressed what qualifies as an "official act."

Drawing on section 201(a)(3) of the federal bribery statute, which defines an official act as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *Id.* at 2357 (quoting 18 U.S.C. § 201(a)(3)) (quotations marks omitted), the *McDonnell* Court held:

> [A]n "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so) -- without more -- does not fit that definition of "official act."

*Id.* at 2371–72.

The Supreme Court went on to fault the district court's instructions to the jury because they failed to include that: (1) the jury "must identify a 'question, matter, cause, suit, proceeding or controversy' involving the formal exercise of governmental power"; (2) "the pertinent 'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any public official'"; and (3) the jury "had to find that [McDonnell] made a decision or took an action -- or agreed to do so -- *on* the identified 'question, matter, cause, suit, proceeding or controversy,'" which excluded "merely arranging a meeting or hosting an event to discuss a matter." *Id.* at 2374–75 (emphasis in original).

As this Court has noted, the "Supreme Court did not hold that section 201(a)(3) of the federal bribery statute necessarily had to be the source for the definition of official action for the purpose of defining the 'quo' in the quid pro quo requirement of honest services fraud and extortion under color of official right," *Silver,* 203 F. Supp. 3d at 378 n. 8, and simply deferred to the parties' selection of this standard. Still, as this Court observed, the Supreme Court did emphasize:

> that an "expansive interpretation of 'official act' would raise significant constitutional concerns." [136 S. Ct.] at 2372. Those concerns include (1) criminalizing virtually all official actions taken on behalf of constituents, even though it is an inherent part of our representative democracy that officials act on behalf of constituents, (2) subjecting public officials to prosecution without fair notice, and (3) setting standards of good government for local and state officials, in contravention of our federalism principles. *Id.* at 2372–73. The Supreme Court was clearly seeking to cabin the "quo" in the quid pro quo element of honest services fraud and extortion in order to avoid these constitutional concerns.

*Silver,* 203 F. Supp. 3d at 378 n. 8.

The Government can be expected to point to the wide-ranging "Overview" section of the Superseding Indictment and to suggest that, notwithstanding the vagueness of the charged Counts, that section provides sufficient notice of the "official acts" necessary for honest services or Hobbs Act convictions to obviate the need for a bill of particulars. Yet even the Government is likely to recognize the inadequacy of this argument. In *United States v. Ng Lap Seng*, No. S5-15 CR-706 (VSB). (S.D.N.Y. Nov. 30, 2016), available at http://globalinvestigationsreview.com/digital_assets/bdf79415-a793-49fa-858e-2fe106481d0f/ng.pdf, for example, the Government responded to a motion "to dismiss the indictment or for a bill of particulars" in a bribery case by parsing the Indictment and Complaint to tease out the precise "official actions" that the Indictment had failed to adequately highlight. Memorandum of Law of the United States at 26-38, *Ng Lap Seng*, available at http://globalinvestigationsreview.com/digital_assets/bdf79415-a793-49fa-858e-2fe106481d0f/ng.pdf (No. S5-15 CR-706 (VSB) ; *see also United States v. Lee*, No. 1:15-CR-445, 2016 WL 7336529, at *3 (N.D. Ohio Dec. 19, 2016).

Given the doctrinal complexities that both the parties and the Court will surely face, and the judicial resources that will be expended both before and during trial, it makes little sense for the Government to wait for a motion to dismiss before it gives Defendants and the Court a chance to determine the alleged basis on which any conviction must rest in this case. Perhaps because it is still deciding how to interpret *McDonnell*, the Government seems to think that its interests are best served by delaying the specification of "official acts" within the meaning of that case for as long as possible. This Court should not accept this tactic.

We note that there is a line of cases ostensibly freeing the Government from the need to specify the official actions that an official agrees to do in exchange for a charged benefit. *See United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007) ("so long as the jury finds that an official accepted gifts in exchange for a promise to perform official acts for the giver, it need not find that the specific act to be performed was identified at the time of the promise, nor need it link each specific benefit to a single official act."); see *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) (upholding charge that defendant paid State legislators "to take official action" "as the opportunities for those actions arose"); *see also United States v. Whitfield*, 590 F.3d 325, 349-50 (5th Cir. 2009); *United States v. Kemp*, 500 F.3d 257, 281 (3d Cir. 2007).

This line of cases, however, is inconsistent with the Supreme Court's more recent analysis in *McDonnell*. There, the Court not only adopted a far more limited definition of "official act" than courts in this Circuit and other jurisdictions had been using, but did so, not simply as a matter of statutory interpretation but because of "significant constitutional concerns." 136 S. Ct. at 2372. One concern supporting a limited definition was the need to avoid unduly chilling "normal political interaction between public officials and their constituents," *Id.* at 2372. But another concern guiding the holding in *McDonnell* was that "[u]nder the 'standardless sweep' of the Government's reading, [] public officials could be subject to prosecution, without fair notice, for the most prosaic interactions." *Id* at 2373 (citing *Kolender v. Lawson,* 461 U.S. 352, 358 (1983)) (quotation marks omitted).

Both the reasoning of *McDonnell* and its constitutional concerns require reconsideration of cases like *Ganim.* This Court must check the Government's effort to draw free license for vagueness and require allegations with such specificity that

defendants are not left without knowledge of what acts are attributed to their alleged wrongdoing.

Because *McDonnell* requires that the quid pro quo at the heart of any honest services or Hobbs Act offense involves an identified and qualifying "official act," the failure of Counts Three, Ten, and Fourteen to identify one or more such acts, and to specify qualifying quid pro quos, amount to impermissible duplicity and requires their dismissal (should the Government fail to provide particulars).

If the Government fails to pin itself down by specifically identifying the "official acts" that the Superseding Indictment alludes to only vaguely, we submit that Counts Three, Ten, and Fourteen of the Superseding Indictment must be dismissed for insufficiency under Federal Rule of Criminal Procedure 12 (b)(3)(B). "The Supreme Court has identified two constitutional requirements for an indictment: first, that it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, that it enables him to plead an acquittal or conviction in bar of future prosecutions of the same offense." *United States v. Lee*, 833 F.3d 56, 69 (2d Cir. 2016) (quotation marks and brackets omitted) (quoting *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007)).

Here, the charging instrument alleges counts for which the Supreme Court has held require an identifiable "official act" as a critical element of the offense, and has also specifically held that various official doings like setting up a meetings or talking to other officials will not -- without more -- satisfy this element. Yet, the Government has failed to do so and meet its burden to plead a sufficient "official act." This is thus a situation where "specification of how a particular element of a criminal charge will be met (as opposed to

categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment."  *United States v. Stringer*, 730 F.3d 120, 126 (2d Cir. 2013).

As the Second Circuit has noted:

> The vice of a duplicitous charge is that it risks to impair "a defendant's rights to notice of the charge against him, to a unanimous verdict, to appropriate sentencing and to protection against double jeopardy in a subsequent prosecution." *United States v. Murray,* 618 F.2d 892, 896 (2d Cir.1980). This is so because a general verdict of guilty on a duplicitous count will not reveal whether the jury reached a unanimous verdict on each offense and "whether the jury found defendant guilty of only one crime and not the other, or guilty of both." *Id.*

*United States v. Crisci*, 273 F.3d 235, 238 (2d Cir. 2001); *see also United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).

This is precisely the risk here.  Because Counts Three, Ten, and Fourteen vaguely allude to official "acts" or "action," and fail to state criminal activity under current doctrine, they provide insufficient guidance to the jury to ensure that the charges rest on grounds that satisfy the law.  Absent further clarification by the Government, dismissal is the only measure to ensure that legally deficient charges do not go to the jury or that a conviction is based on a legally insufficient ground.

## C.  Wire Communications

Counts One, Two, and Ten charge wire fraud without any indication of which specific foreign or interstate wire communications provide the basis for the bringing of these counts.  In *United States v. Silver*, 117 F. Supp. 3d 461 (S.D.N.Y. 2015), this Court was presented with a similar lack of attention to an element of the charges.  It noted that Silver had "correctly noted" that the Indictment was:

devoid of any specific information regarding the dates of the allegedly offending mailings and wire transmissions, and it include[d] language permitting the Government to rely on *any* mailing or wire transmission in furtherance of Silver's wide-ranging crimes to satisfy that element of the charges. [] Given the exceptional volume of mailings and wire transmissions in this case, the potentially relevant communications could easily number in the hundreds or thousands. Under those circumstances, it is not unreasonable for the Defendant to want to know which mailings and wire transmissions the Government will rely upon to prove its case.

*Id*. at 471 (emphasis in original).

The Court therefore ordered the government:

to provide Silver with a limited Bill of Particulars, or to show cause why it should not be ordered to provide such Bill of Particulars, "identifying the specific mailings and wire transfers" on which it will rely to prove the charges contained in Counts One through Four. [*United States v.*] *Reale,* [No. S4 96-CR-1069 (DAB)], 1997 WL 580778, at *14 [(S.D.N.Y. 1997)]; *see also United States v. Ajemian,* No. 11–CR–1091(VM), 2012 WL 6762011, at *2 (S.D.N.Y. Dec. 27, 2012); *accord United States v. Scully,* 108 F. Supp.3d 59, 126, No. 14–CR–208(ADS), 2015 WL 3540466, at *67 (E.D.N.Y. June 8, 2015); *United States v. Rajaratnam,* No. 09–CR–1184 (RJH), 2010 WL 2788168, at *3–4 (S.D.N.Y. July 13, 2010), *aff'd on other grounds,* 719 F.3d 139 (2d Cir. 2013); *United States v. Bin Laden,* 92 F. Supp. 2d 225, 235 (S.D.N.Y.2000).

*Id*.; *see also United States v. Tavares,* 844 F.3d 46, 58-62 (1st Cir. 2016) (reversing after finding mailing "in furtherance" element not satisfied).  Defendants ask for precisely such an order here.


### D.  Unnamed Co-conspirators

"A court considering a defendant's request for the identity of unindicted co-conspirators must engage in a highly fact-specific inquiry." *United States v. Solomonyan*, 451 F. Supp. 2d 626, 641 (S.D.N.Y. 2006).  As Judge Cote noted in *United States v. Chalmers*, 410 F. Supp. 2d 278 (S.D.N.Y. 2006), while courts in this district "frequently deny such requests, courts in this district regularly grant them, as well." *Id*. at 286.  The Second Circuit "has upheld decisions granting and denying requests for the identity of co-

conspirators." *Id.* Thus, "[t]he determination of whether to compel the Government to provide a defendant with the identities of unindicted co-conspirators, whether or not they will be called as witnesses, is well within the discretion of the district court." *United States v. Shteyman,* No. 10-CR-347 (SJ), 2011 WL 2006291, at *8 (E.D.N.Y. May 23, 2011) (citing *United States v. Nachamie,* 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000).

As the *Solomonyan* Court went on to note:

> The question is whether the names of unindicted co-conspirators are necessary to prepare a defense and avoid surprise. *Chalmers,* 410 F. Supp. 2d at 286–87; *United States v. Nachamie,* 91 F. Supp. 2d 565, 572–73 (S.D.N.Y. 2000). Determination of that issue turns on a number of factors, including "(1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the Government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation." *Nachamie,* 91 F. Supp. 2d at 572–73.

*Solomonyan,* 451 F. Supp. 2d at 641-42.

Here, the Superseding Indictment's broad allegations and vague allusions as to how actions by unnamed State officials and others furthered the charged criminal schemes give no sense of who was a co-conspirator and who was not. Nor does the Government's discovery -- strangely both voluminous and inadequate -- cure the problem. Indeed, the lack of notice is only aggravated by the "mountains of unorganized discovery." *United States v. Kahale*, 789 F. Supp. 2d 359, 372 (E.D.N.Y. 2009); *see also United States v. Oruche,* No. 07-CR-0124 (WHP), 2008 WL 612694, at *4 (S.D.N.Y. Mar. 5, 2008); *United States v. Lino,* No. 00-CR-632 (WHP), 2001 WL 8356, at *12-13 (S.D.N.Y. 2001) (a large number of co-conspirators, a broad conspiracy, and voluminous discovery weigh in favor of disclosure of unindicted co-conspirators). As for potential danger to co-conspirators or harm to the Government's investigation -- neither poses any risk here.

The Superseding Indictment does not even inform Gerardi and Aiello whether they will be alleged as co-conspirators in the vague extortion conspiracy charged in Count Six, which charges Percoco with obtaining cash payments from the Energy Company and the Syracuse Developer "with their consent, such consent having been induced under color of official right." (Ind. ¶ 49). As the Supreme Court recently made clear in *Ocasio v. United States*, 136 S. Ct. 1423 (2016), it is quite possible for individuals without official status, and thus incapable of committing "under color of official right" extortion as principals, to conspire to commit that offense with the very officials that "extort" money from them. *Id.* at 1432. The Court went on to note, however, that its reading of the Hobbs Act does not:

> transform every bribe of a public official into a conspiracy to commit extortion. The "consent" required to pay a bribe does not necessarily create a conspiratorial agreement. In cases where the bribe payor is merely complying with an official demand, the payor lacks the *mens rea* necessary for a conspiracy. . . . For example, imagine that a health inspector demands a bribe from a restaurant owner, threatening to close down the restaurant if the owner does not pay. If the owner reluctantly pays the bribe in order to keep the business open, the owner has "consented" to the inspector's demand, but this mere acquiescence in the demand does not form a conspiracy.

*Id.* at 1435-36 (citations omitted).

When Percoco allegedly "obtained" payments from the Syracuse Developer "with their consent," did any and all of those payments entail a victimization of them or a conspiracy with them? And if they are (unnamed) co-conspirators, with whom else did they conspire? Defendants are entitled to know as they prepare for trial.

## E. False Statements

It ought to, but sadly cannot, go without saying that where a Superseding Indictment charges Defendants with having made false statements, the Government must precisely

specify which statements are at issue.  The fact that they are an element of the crime is only one reason for imposing that obligation.  In the absence of such specification -- either in the Superseding Indictment or in a bill of particulars -- Defendants may lose their ability to contest a constructive amendment of the Superseding Indictment or a prejudicial variance.  *See United States v. Kaplan*, 490 F.3d 110, 128-30 (2d Cir. 2007) (finding no constructive amendment or prejudicial variance between trial proof and indictment "as clarified in a bill of particulars"); *see also United States v. Sakoc*, 115 F. Supp. 3d 475 (D. Vt. 2015) (granting motion for new trial based on constructive amendment where government referred to alleged false statement not specified in indictment or pleadings).

Defendants are not asking to know how the Government will prove or show falsity, but are asking for the particulars as to the statements on which the Government will rely.  As the Court noted in *United States v. Carey*, 152 F. Supp. 2d 415 (S.D.N.Y. 2001) which involved violations of both the perjury statute and 18 U.S.C § 1001:

> Most courts that have addressed the issue of a bill of particulars in a perjury prosecution have been satisfied where the defendant is provided notice of the actual statements which are allegedly perjurious. *See, e.g.,  Bin Laden,* 92 F. Supp. 2d at 243 (noting that government's voluntary identification of allegedly false statements provided satisfactory notice to defendant to defend perjury and false statements prosecution); *United States v. Burke,* 87 Cr. 0703(DNE), 1988 WL 6217 *1 (S.D.N.Y. Jan. 7, 1988) (Brieant, J.) (denying motion for bill of particulars where indictment contained "answers in which the defendant is alleged to have perjured himself and the questions that precipitated those answers"); *United States v. David,* 86 Cr. 454 (JFK), 1986 WL 13805 *3 (S.D.N.Y. Nov. 21, 1986) (Keenan, J.)

*Carey,* 152 F. Supp. 2d 415, 431 (S.D.N.Y. 2001).

As the court noted in *United States v. Trie*, 21 F. Supp. 2d 7 (D.D.C. 1998), when chiding the Government for what "smacks as gamesmanship", a "defendant faced with

false statements charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against." *Id*. at 21.

Should the government not give the particulars sought here, Count Fifteen must also be dismissed for duplicity. When discussing how, "for certain statutes," "specification of how a particular element of a criminal charge will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment," the Second Circuit explicitly included false statement charges. *United States v. Stringer*, 730 F.3d 120, 126 (2d Cir. 2013). It noted that among "examples that courts have found to fall" in that category "have been specification of what statements are alleged to be false, and in what respect they are false, in charges of criminal falsity, *see United States v. Tonelli*, 577 F.2d 194, 200 (3d Cir.1978) ('Because the indictment in this case did not set forth the precise falsehoods alleged and the factual bases of their falsity with sufficient clarity to permit a jury to determine their verity and to allow meaningful judicial review of the materiality of those falsehoods, the conviction here must be vacated') (internal quotation marks and alterations omitted))." *Stringer,* 730 F.3d at 126-27; *see also United States v. Berardi,* 629 F.2d 723, 729 (2d Cir. 1980) ("it has long been accepted practice to charge perjury before the grand jury, committed in the course of the same appearance, in a one count indictment with each false declaration set forth in a particular specification") (citing *United States v. Otto*, 54 F.2d 277, 280-81 (2d Cir. 1931); *United States v. Butler*, 351 F. Supp. 2d 121, 127 n.4 (S.D.N.Y. 2004).

The Superseding Indictment vaguely alleges that Aiello and Gerardi "each separately made statements denying involvement in paying [Percoco], and in tailoring the

Syracuse RFP for the benefit of their company." (Ind. ¶ 69). Aiello, however, was interviewed for about six hours, and Gerardi, for about three or four hours. On precisely which of their many statements will the Government be asking the jury to convict? All of them? Some of them? And if only a subset of their many statements to the Government, will the Government be identifying those statements for jurors at the beginning of the case? At the end? Will those identified at the beginning be the same as those highlighted at the end? Or will the Government never pin itself down, and just throw a handful or more at the jury, hoping that, should jurors not be unanimous as to which were false, that non-unanimity would be concealed by a general verdict?

At trial, Aiello and Gerardi will of course ask that the Court to instruct the jury that it must "unanimously agree on any statement that the defendant made in violation of the false statement statute." *United States v. Crisci*, 273 F.3d 235, 239 (2d Cir. 2001) (quotation marks omitted). Any such instruction, however, cannot substitute for the pretrial specification of the precise statements alleged to be false. And, in the absence of such specification, Count Fifteen must be dismissed.


**MOTION FOR SEVERANCE**

Defendants Aiello and Gerardi seek severance of offenses and defendants under Rules 8 and 14 of the Federal Rules of Criminal Procedure, because, as illustrated by the Government's own chart (see Exhibit J), the Preferred Developer Wire Fraud conspiracy charged in Count One is not a facially cognizable single conspiracy. Upon recognizing that Count One is facially insufficient as a single conspiracy, the basis for trying Aiello and Gerardi with the Buffalo Defendants falls apart. Nor is there any legal

basis for trying Aiello and Gerardi with Kelly. All the Government has done is thrown two different RFP processes together and two different alleged bribery schemes together, all in service of an unfairly prejudicial joint trial. However as much as the Government would like Todd Howe to testify once about sundry misconduct of which he claims knowledge, the Federal Rules look not to prosecutorial efficiency but to fairness, judicial economy, and charging cohesion. All of these considerations strongly counsel, indeed require, breaking up this sprawling Superseding Indictment into its component parts.

Because "on any but a superficial reading," Count One -- the glue by which the Government seeks to hold the Syracuse and Buffalo Defendants together -- "appears to actually allege two distinct conspiracies and thus to offend the prohibition against combining multiple conspiracies within a single conspiracy count," *United States v. Gabriel*, 920 F. Supp. 498, 504 (S.D.N.Y. 1996), we normally would ask this Court to dismiss it for duplicity. The Second Circuit, however, "has repeatedly cautioned that the determination of whether a conspiracy is single or multiple is an issue of fact 'singularly' well suited to determination by a jury." *Id.*; *United States v. Ohle*, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010). Under current doctrine, even "boilerplate allegations of a single conspiracy" can survive a motion to dismiss for duplicity if a defendant cannot show on the basis of the pleadings alone that "there is *no* set of facts" falling within the conspiracy count "that could warrant a reasonable jury in finding a single conspiracy." *Gabriel*, 920 F. Supp. at 504-05 (emphasis in original); *see also Ohle*, 678 F. Supp. 2d at 222; *United States v. Rajaratnam*, 736 F. Supp. 2d. 683, 688 (S.D.N.Y. 2010). Faced with just the sort of "boilerplate" allegation envisioned by these cases, Aiello and Gerardi will forgo a motion to dismiss Count One for duplicity although the Court would be well within its

discretionary power to grant such relief at this juncture. Certainly, though, when the time comes, we will be asking for multiple conspiracy jury instructions. For now, our focus is on the improper use of Count One to hold the Buffalo and Syracuse parts of this case together and or the need to separate them. We will also show how the two different bribery conspiracies that the Government originally threw together into a single honest services conspiracy (former Count Nine) and now have separated into Counts Nine and Ten remain improperly joined under Rules 8 and 11. Specifically, Aiello and Gerardi seek to be severed from both Defendant Kelly and the Defendants Ciminelli, Schuler, and Laipple.

### A. Severance Under Rule 8

Even as Aiello and Gerardi will wait until trial to request the multiple conspiracy charge on Count One, they now can appropriately urge this Court to grant them a severance, under Fed. R. Crim. P. 8, from the Buffalo Defendants charged with a completely different RFP scheme, and from Peter Gailbraith Kelly, who is charged with wholly unrelated alleged bribery payments.

Notwithstanding the "preference" for joint trials for defendants indicted together, *United States v. Feyrer,* 333 F.3d 110, 114 (2d Cir. 2003), "[u]nless the standards set out in Rule 8(b) are met, a motion for severance should be granted even absent a showing of prejudice." *Id.* at 113. Rule 8 of the Federal Rules of Criminal Procedure provides:

(a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged ... are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

(b) Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.

> The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8.

As the Circuit has explained: "Unlike Rule 8(a), Rule 8(b) does not permit joinder of defendants solely on the ground that the offenses charged are of 'the same or similar character.' Thus, though both subdivisions of Rule 8 focus on the nature of the acts constituting the alleged offenses, 8(b) provides a more restrictive test when multiple defendants are involved." *United States v. Turoff,* 853 F.2d 1037, 1042–43 (2d Cir. 1988). And it is under Rule 8(b) that the motion of a defendant in a multiple-defendant case challenging the joinder of offenses is to be analyzed. *Id.* at 1043; *see also United States v. Shellef*, 507 F.3d 82, 97-98 (2d Cir. 2007).

Under Rule 8(b) joinder is proper where two or more persons' criminal acts are (1) "unified by some substantial identity of facts or participants," or (2) "arise out of a common plan or scheme." *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (quoting *United States v. Cervone*, 907 F.2d 332, 341 (2d Cir.1990)) (quotation marks omitted). To determine if there is a "substantial identity of facts or participants," the Second Circuit has looked to whether "a reasonable person would easily recognize the common factual elements that permit joinder." *Turoff*, 853 F.2d at 1044; *Shellef*, 507 F.3d at 98. For example, joinder is proper where, if there were two separate trials, "the evidence at one trial would essentially duplicate the evidence at the other," *Feyrer*, 333 F.3d at 114, or where "proof of one scheme is indispensable for a full understanding of the other," *Turoff*, 853 F.2d at 1044. Conversely, joinder is improper where "[c]ommission of one of the offenses neither depended upon nor necessarily led to the commission of the other" and "proof of the one act neither constituted nor depended upon proof of the

other." *United States v. Halper*, 590 F.2d 422, 429 (2d Cir.1978); *see United States v. Geddes*, Cr. No. 3-14-CR-228 (JBA), 2015 WL 1530800 (D.Conn. 2015).

## B. The Two RFP Conspiracies

A "common plan or scheme" generally exists where there is "a non-frivolous conspiracy charge." *United States v. Nerlinger,* 862 F.2d 967, 973 (2d Cir. 1988); *see United States v. Conyers,* No. S13 15-CR-537 (VEC), 2016 WL 7189850, at *5 (S.D.N.Y. Dec. 9, 2016). Yet Count One, the only charge that links the Buffalo Defendants with the Syracuse Defendants, manifestly charges multiple conspiracies that this Court should recognize ought to be tried separately. There is no overarching agreement. The schemes have different memberships, goals, and no overlap. In short, the effort to throw the two groups together into one conspiracy charge is nothing but frivolous.

To be sure, "a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990); *see United States v. Berger*, 224 F.3d 107, 114-15 (2d Cir. 2000); *United States v. Felder*, No. S2 14-CR-546 (VEC), 2016 WL 5852554, at *2 (S.D.N.Y. Oct. 5, 2016). Yet the disparate allegations crammed into Count One can hardly be called parts of "one integrated fraudulent scheme." *United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651, at *4 (S.D.N.Y. Jan. 18, 2017).

As the Superseding Indictment itself notes, at ¶ 23, there were "two requests for proposals (the 'RFPs'), one for Syracuse (the 'Syracuse RFP') and one for Buffalo (the 'Buffalo RFP')." At no point does the Superseding Indictment even suggest how the RFP

process in Syracuse was related to, or affiliated in any way with the RFP process in Buffalo. In fact, the two RFP processes occurred during different time periods. Moreover, the Syracuse Defendants' transaction with Fort Schuyler did not depend in any way on the Buffalo Defendants' dealings with Fort Schuyler. These were two different deals in two different geographical regions. None of the Buffalo Defendants had any role in the Syracuse RFP process, and none of the Syracuse Defendants was involved in the Buffalo RFP. *See United States v. Lech*, 161 F.R.D. 255 (S.D.N.Y. 1995) (Sotomayor, J.) (counts against defendant and other contractors, for allegedly conspiring to secure asbestos removal contract by bribing public officials, could not be joined with separate charges against these other contractors, and not defendant, for similar conspiracy in connection with different construction project, where defendant had little if any knowledge of other conspiracy and did not participate therein); *see also United States v. Yaron*, No. S2 10-CR-363 (GBD), 2011 WL 3279054 (S.D.N.Y. July 28, 2011) (granting severance where two hospital executives were charged in a single indictment for their roles in two separate schemes to defraud their employer by accepting kickbacks in return for awarding two separate contracts).

The Government has not alleged any connection or nexus between the Syracuse Defendants' businesses and the Buffalo Defendants' businesses. The only purported link is that they -- like many other business entities -- made the mistake of using Todd Howe's services as a result of Howe's connections with SUNY Poly and Fort Schuyler -- entities that regularly enter into multiple, separate, and distinct business transactions statewide.

At best, the Superseding Indictment thus lays out a dubious "wheel" conspiracy, "multiple conspiracies of a similar nature linked by a common participant," *United States*

*v. Berger*, 224 F.3d 107, 115 (2d Cir. 2000); *see Kotteakos v. United States*, 328 U.S. 750 (1946) ("We do not think that . . . Congress . . . intended to authorize the Government to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all"). In this case, the spokes of the wheel do not connect. As in *United States v. Johansen*, 56 F.3d 347 (2d Cir. 1995), the Government's effort to have a cooperator do double duty by testifying against two different groups that, lacking any common goals, are simply linked by the fact that they each allegedly pursued a similar scheme with the cooperator will lead only to confusion and prejudice, and, we believe, reversal. Todd Howe has been revealed to be, to the surprise of the Defendants, a massively corrupt schemer who sought to monetize his political influence with any number of people trying to do business with the State. Yet the only, slender reed the Government has offered -- belatedly, in the Superseding Indictment -- to connect the Buffalo and Syracuse Defendants, is the allegation in ¶ 24 that the Defendants "collaborated in secretly tailoring the Syracuse and Buffalo RFPs by, among other things, exchanging through Howe ideas for potential qualifications to be included in the Syracuse and Buffalo RPFs." Read carefully, however, the claim is that Howe, who was affiliated with entities engaged by two companies, separately solicited and then unilaterally elected to share information from the Buffalo construction company with the Syracuse construction company, and vice versa (unbeknownst to each entity responding to Howe), to supposedly help Howe fulfill his role as consultant for each. The two companies, of course, ultimately separately responded to separate RFPs for different roles in different projects of varying scope and different purposes in different cities. This instance of Howe's two schemes brushing up against one

another is a far cry from the context of "mutual dependence and assistance" that supports the charging of a single conspiracy with "two or more phases or spheres of operation." *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir.1990).

Even as Count One alleges a single RFP conspiracy -- perhaps to reap the benefit of spillover prejudice, with weak evidence of one scheme propping up weak evidence of another; perhaps to spare Todd Howe from having to testify twice -- the Superseding Indictment's related substantive counts are less disingenuous and acknowledge the separation:  they charge one scheme involving Aiello and Gerardi and the Syracuse RFP -- Counts Two and Three -- and another scheme involving the Buffalo Defendants and the Buffalo RFP -- Counts Four and Five.  Because the proof of Counts Two and Three, and the evidence relating to Aiello and Gerardi for Count One will not overlap or depend on the proof relating to the Buffalo RFP; because, conceptually, the alleged Syracuse RFP scheme relates to the Buffalo RFP scheme only as similar corrupt enterprises of Todd Howe; and because Aiello and Gerardi will be unfairly prejudiced by the improper joinder of these multiple conspiracies, severance under Rule 8 of Counts Two and Three from Counts Four and Five is appropriate here.

These two sets of RFP counts should also be severed from the Percoco bribery section of the Superseding Indictment.  Howe may figure prominently in all of these schemes, but it cannot seriously be claimed that the relationship between the two RFP schemes and the two Percoco bribery schemes goes beyond that.  This is manifestly a situation where "[c]ommission of [the RFP] offenses neither depended upon nor necessarily led to the commission of the [bribery offenses]" and "proof of the one [] neither

constituted nor depended upon proof of the other." *United States v. Halper*, 590 F.2d 422, 429 (2d Cir. 1978)

## C. Percoco/Kelly Counts

Particularly now that the Government, in the Superseding Indictment, has abandoned its initial effort to claim (in former Count Nine) an overarching honest services fraud conspiracy that purported to link Aiello and Gerardi to Peter Galbraith Kelly simply through their separate and distinct dealings with Percoco, there is no basis under Rule 8 for joining Count Nine, and its associated substantive counts, with Count Ten, and its associate substantive counts. This Court should therefore sever Counts Ten, Twelve, and Fourteen against Aiello and Gerardi relating to their alleged payments to Percoco from Counts Nine, Eleven, and Thirteen against Kelly for his payments. Count Eight, charging only Percoco for the payments from Aiello and Gerardi, should be tried with Counts Ten, Twelve, and Fourteen, and Count Seven, charging only Percoco for payments from Kelly and the Energy Company, should be tried with Count Nine, Eleven, and Thirteen. Count Six against Percoco, which charges Percoco alone with conspiring to extort the Energy Company and the Syracuse Developer, should also be severed into its two component parts.

Creative charging simply cannot conceal the essential distinctiveness of the bribery charges against Aiello, Gerardi and Percoco from those against Kelly and Percoco. To begin, the scheme involving Kelly and the Energy Company lasted far longer -- from in or about 2012 to in or about 2016 -- than that charged against Aiello and Gerardi -- 2014 to 2015. Nor were the objectives of the two schemes at all related. The object of the scheme with the Energy Company was to secure an agreement "to purchase emissions credits in

New York worth millions of dollars to the Energy Company." (Ind. ¶31). The alleged scheme involving the Syracuse Defendants was for Percoco to exert his influence "on an as needed basis," with three random and unrelated results: (1) securing a raise for Steve Aiello Jr.; (2) evading the necessity for a Labor Agreement; and (3) expediting payment of millions of dollars owed by New York State to the Syracuse Developer. This scheme involved "approximately $35,000" in bribes, in stark contrast to the "more than $287,000" in alleged bribery payments alleged with respect to Kelly and the Energy Company. Again, the only commonality is that two different groups of Defendants -- doing business in different industries and with very different needs -- mistakenly relied on Todd Howe.

The allegations in the Superseding Indictment highlight the existence of four separate, unrelated, and distinct schemes, as illustrated by Exhibit F.

## D. Severance Under Rule 14

Even if the Court finds that joinder was permissible under Fed. R. Crim. P. 8(b), Aiello and Gerardi ask that the Court grant them a severance -- Counts Two and Three from Counts Four and Five, and, Counts Eight, Ten, Twelve, and Fourteen from Counts Seven, Nine, Eleven, and Thirteen under Rule 14(a) -- because they would be prejudiced by a joint trial. As the Court observed in *United States v. Forde*, 699 F. Supp. 2d 637 (S.D.N.Y. 2010)

> In deciding whether severance is warranted pursuant to Rule 14(a), the following considerations should be weighed: (1) the number of defendants and the number of counts; (2) the complexity of the indictment; (3) the estimated length of the trial; (4) disparities in the degrees of involvement by defendants in the overall scheme; (5) possible conflict between various defense theories; and (6) prejudice resulting from evidence admissible as to some defendants, but not others. *See United States v. Santiago,* 174 F. Supp. 2d 16, 22 (S.D.N.Y.2001). "While none of these factors is dispositive, each is intended to provide guidance as to whether a jury will be

capable of considering the evidence as to each defendant separately, independent of evidence against co-defendants." *Id.*

*Forde,* 699 F. Supp. 2d at 643.

Essentially, the Government lumped together two distinctly different RFP conspiracies and two distinctly different schemes to bribe Percoco, presumably in hopes that the jury will jump to the conclusion that anyone seeking the assistance of Todd Howe in dealing with the State must have committed crimes. Yet there is no reason to expect that the evidence against one Defendant will be admissible against all the others. Even if this Court finds that facial validity of the various conspiracy charges devised by the Government precludes severance under Rule 8, the Government still must prove, by a preponderance of the evidence, a conspiracy involving every Defendant in this case, if it wants to introduce co-conspirator statements under Fed. R. Evid. 801(d) (2) (E) against all defendants -- at least if it wants to avoid limiting instructions, which may or may not work. *See United States v. Desena*, 260 F.3d 150, 157-59 (2d Cir. 2001); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). And that it will be unable to do. Better that inability be recognized now rather than at the close of the evidence, when the problem cannot be cured.

Moreover, this is not a case where severance would lead to "the evidence at one trial essentially [duplicating] the evidence at the other." *See Feyrer*, 333 F.3d at 114; *United States v. Conyers*, No. S13 15-CR-537 (VEC), 2016 WL 7189850, at *6 (S.D.N.Y. Dec. 9, 2016). At least with respect to the Syracuse Defendants and the Buffalo Defendants, the alleged RFP schemes do not overlap in conception or proof. Neither do the Syracuse Developer and Energy Company bribery schemes.

The Superseding Indictment does not even try to link the two alleged RFP schemes together, other than to allege that Howe and Kaloyeros "devised a plan to secretly rig Fort

Schuyler's bidding process." (Ind. ¶ 22).  There is no allegation, however, of coordination between the Syracuse and Buffalo RFP Defendants, and the discovery in this case gives no reason to expect that coordination will be shown at trial.  Nor is there any allegation that these Syracuse and Buffalo Defendants even had any awareness of any larger scheme.  Rather, these were two entirely distinct RFP processes, for projects of different types, in two completely separate geographic regions.  What is more, the possibility that a Downstate jury may not appreciate that Syracuse and Buffalo are 150 miles apart is an additional concern regarding inappropriate jury conflation of the two schemes.  The scale of the two projects is also substantially different.  As noted in ¶ 27 of the Superseding Indictment, the Buffalo project was valued at $750 million and was thus more than seven times the size of the $105 million Syracuse project.  Recognizing the essential distinctiveness of each scheme, the Superseding Indictment charges each as a separate "scheme to defraud" in the substantive Wire Fraud Counts (Two and Four).  And this separation provides the dotted line along which the jumbled conspiracy allegations in Count One should be cut, to ensure that the jury is not left with the misimpression that the Syracuse Defendants were involved in some overarching $855 million fraud that spanned Northern New York.

It would be hard enough for Aiello and Gerardi to keep the jury from jumping (without evidence) to the conclusion that the alleged Syracuse RFP scheme must be related to the alleged Buffalo scheme simply because the two were charged together in a conspiracy count, with the Syracuse Defendants required to sit together with the Buffalo defendants in a trial that the Government says will run six to eight weeks.  Yet the risk that

the jury will not be able to focus on the evidence against the two is made even greater by charging them together with Kelly.

Here again, the Superseding Indictment's separation of the Aiello and Gerardi substantive bribery counts from the Kelly bribery counts highlights how the two schemes are both distinct and easily separated. And that ease of separation flows from the basic fact that Aiello's and Gerardi's alleged interactions with Howe and Percoco had nothing to do with, and were both quantitatively and qualitatively different from, Kelly and his Energy Company's interactions with those two men. Aiello and Gerardi were in different industries from Kelly, allegedly sought help from Howe and Percoco in completely separate matters, and allegedly paid $35,000, compared to the $287,000 that Kelly allegedly paid. Tellingly, nowhere in the Superseding Indictment are these schemes tied together. Defendants believe it would be easy for a jury, in a long trial with complex proof, to assume that Kelly's dealings with Howe and Percoco shed light on Aiello's and Gerardi's dealing with these men, which of course would prejudice Defendants. This kind of unfounded assumption is the essence of spillover prejudice, and the risk of it amply supports severance under Rule 14.

## MOTION TO STRIKE SURPLUSAGE

Rule 7(d) of the Federal Rules of Criminal Procedure provides that, upon motion by a defendant, the Court may strike extraneous matter or surplusage from an indictment. To be sure, "'[m]otions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and

prejudicial.'" *United States v. Mulder*, 273 F.3d 91, 99–100 (2d Cir. 2001) (quoting *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir.1990)); *see Silver*, 117 F. Supp. 3d at 473.

These preconditions are met with respect to ¶ 23 of the Superseding Indictment, which alleges that Howe and Kaloyeros "preselected" the Buffalo and Syracuse Developers after those firms "had each made sizeable contributions to the Governor's reelection campaign and had begun paying Howe in exchange for Howe's influence over the RFP process." This is the sole appearance in the Superseding Indictment of allegations relating to political campaign contributions, and their only purpose is to suggest some sort of connection between the contributions and the charged scheme that the Government never even bothers to spell out in the Superseding Indictment. Unless the Government explains otherwise, the Court should ensure that political contributions to the Governor or anyone else, made as a legitimate exercise of Defendants' First Amendment rights, play no part in this case or the Superseding Indictment.

This is not a case in which the Superseding Indictment sets out a theory of access or favor obtained because of political contributions. *Compare United States v. Ring*, 706 F.3d 460, 472-74 (D.C. Cir. 2013) (no abuse of discretion in trial judge's admission of evidence of lobbyist's campaign contribution, where trial judge's repeated instructions "did much to mitigate the potential for confusion and First Amendment chilling, even if it could not have entirely eliminated the potential for prejudice"). If the Government intends to pursue such a theory, it should provide Defendants notice at this charging stage. Rather, the political contribution reference is simply an effort to create smoke -- in the first instance among those who read the Superseding Indictment, and in the second, at trial. The Defendants ask this Court not to tolerate these efforts. Moreover, if the Government is

allowed to keep this line of proof in the Superseding Indictment and the case, this Court would be bound, pursuant to the doctrine of strictissimi juris, to ensure "'meticulous inquiry into the sufficiency of proof'" that the contributions were made for illegitimate, rather than legitimate purposes. *United States v. Sanders*, 211 F.3d 711, 722 (2d Cir. 2000) (quoting *United States v. Dellinger*, 472 F.2d 340, 392 (7th Cir. 1972)).

In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court made clear that political contributions and expenditures implicate core First Amendment protections, and that restrictions on them "operate in an area of the most fundamental First Amendment activities." *Id.* at 14; *see also Fed. Election Com'n v. Wisconsin Right to Life*, 551 U.S. 449, 486 (2007) (Scalia, J., concurring); *Ognibene v. Parkes*, 671 F.3d 174, 182-84 (2d Cir. 2012) (discussing judicial review of restrictions on campaign contribution). Just as legislatures must take care not to violate First Amendment rights when regulating political contributions, a criminal jury must take special pains when asked to draw inferences of criminal activity from what might be a campaign contribution spurred by a candidate's platform.

It is true that "[c]ourts in this district routinely await the presentation of the Government's evidence at trial before ruling on a motion to strike surplusage." *United States v. Ulbricht*, No. 14-CR-68 (KBF), 2014 WL 5090039, at *17 (S.D.N.Y. 2014). But this approach is inappropriate here, and Judge Weinfeld's admonition more relevant: "It is no answer, as the Government suggests, that the matter be left to the trial judge 'and should he decide at the conclusion of the trial that these allegations should not be submitted to the jury, they may then be blocked out.' While it is true that surplusage in an indictment may be disregarded, the inclusion of the questioned allegations serves no purpose other

41

than possible prejudice to the defendants." *United States v. Verra*, 203 F. Supp. 87, 90 (S.D.N.Y. 1962).

<u>**MOTION TO DISMISS FOR PREINDICTMENT PREJUDICE**</u>

The Government's history of systemic and pervasive misconduct raises serious questions about the fundamental fairness of the Grand Jury process in this case. Whether or not they intended to do so, the prosecutors in this case conducted a sophisticated media campaign that saturated the public's consciousness with their self-serving version of events. By doing so even before the Grand Jury considered an Indictment, the Government deprived defendants of their Fifth Amendment right to have his case considered by an impartial and unbiased jury. *See United States v. Burke*, 700 F.2d 70, 82 (2d Cir. 1983). Perhaps the prosecutors rested secure in the case law that, we concede, makes it quite hard for defendants to obtain relief from such a challenge to the integrity of the Grand Jury process. This Court is particularly well informed and placed, however, to grant defendants relief and end these hitherto unchecked and improper prosecutorial tactics.

In *United States v. Silver*, 103 F. Supp. 3d 370 (S.D.N.Y. 2016) this Court, faced with the same issue, did not grant any of the requested relief but noted that the U.S. Attorney for the Southern District had "strayed so close to the edge of the rules governing his own conduct that Defendant Sheldon Silver [had] a non-frivolous argument that he fell over the edge to the Defendant's prejudice." *Silver*, 103 F. Supp. 3d 370, 373 (S.D.N.Y. 2015). Here we are again. The same prosecutor, the same playbook.

We are now at that point where dismissal is appropriate since the Government's "history of prosecutorial misconduct, spanning several cases, [...] is so systematic and

pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the Indictment." *Bank of Nova Scotia v. United States*, 487 U.S. 250 at 259 (1988). In the alternative, the Government's cumulative conduct in this matter justifies the release of the Grand Jury minutes for the Court's inspection, as well as the polling of the Grand Jury to determine the impact of the Government's prejudicial media campaign.

## A. Government's Media Strategy

The indictments in this case follow the two highest profile public corruption trials in modern history: the trials of Dean Skelos and Sheldon Silver. After publicly trumpeting the charges against Speaker Silver, the U.S. Attorney for the Southern District of New York, Preet Bharara, noted that his office had only begun its investigation into public corruption and advertised that the public should "Stay tuned." (Exhibit G.) Following Silver's conviction, Bharara, repeated the teaser, Tweeting, "Stay tuned." (Exhibit H.)

On September 22, 2016, Bharara's office delivered on his promise and had the Defendants in this case arrested on the purported strength of an 80-plus page criminal complaint, complete with a table of contents. (Exhibit I.) The complaint went well beyond the required "essential facts" for the charges, see Federal Rule of Criminal Procedure 3, and doubtless was intended to provide color commentary for the highly unnecessary and prejudicial way the defendants were arrested.

At 6:00 AM on September 22, 2016, Aiello, Gerardi and their families were awakened by FBI agents, with guns drawn, banging on their doors to serve arrest warrants. Aiello was handcuffed in front of his wife and children and Gerardi as handcuffed in his

bedroom. Then, they were driven in FBI cruisers to the federal court house, displayed on a perp walk, and arraigned. There was no operational need for this extraordinarily prejudicial drama.

In *Silver*, this Court noted the government showed "considerable sensitivity" by allowing Silver to surrender himself rather than be arrested. *Silver,* 103 F. Supp. 3d 370 at 378. No such sensitivity was shown here, despite the same offer to voluntarily surrender. And the government compounded the insult and prejudice by inflicting a perp walk despite the absence of legitimate law enforcement purpose to do so. *Lauro v. Charles*, 219 F.3d 202, 213 (2d Cir. 2000) (finding that a perp walk with no legitimate law enforcement purpose can violate the Fourth Amendment).

Hosting a press conference the same day, Bharara, with a generous sprinkling of use of the word "allegedly", made detailed and fact-specific statements about each defendant's respective culpability with the assistance of demonstrative aides. (Exhibit J.) True to his "Stay tuned" promise, Bharara expertly tied these allegations together with the convictions of Silver and Skelos, stating, "[i]n essence today's complaint shines a light on yet another sordid side of a show me the money culture that has so plagued government in Albany. It turns out that the state legislature does not have any kind of monopoly on crass corruption in New York." (Exhibit K.)

This Court is familiar with this tactic and has explicitly condemned it. In *Silver,* it noted: "[r]emarks that associate the accused with a long line of convicted criminals or a broader pattern or recognized wrong doing, however, are of concern specifically because they tend to blur the distinction between legitimate public commentary and improper opinion." *Silver*, 103 F. Supp. 3d 370 at 379.

The Government's effort bore its natural fruit: widespread condemnation of the defendants and support for the case long before any Grand Jury consideration. On the day of their arrest, a single article from Syracuse.com alone received 167 comments regarding the allegations against Aiello, Gerardi and the other defendants – comments that treated the results of future grand jury proceedings and trial itself as beside the point. A sample:

> **From user CommonSense:** It's not just the $35k...it's also about the $300k in campaign contributions by COR et al, which bought COR many millions in no-bid projects that likely cost the taxpayer much more than it should have and made COR a healthy profit. I will agree this has been going on forever - an insult to the honest bidder and taxpayer. These guys played by the longstanding tactics and got caught.

> **From user OldML:** If the Feds got involved, you know it is serious. Aiello's lame reply referencing his innocence is probably just a couple hours away folks. Preet will carve the COR scammers like the Thanksgiving turkey though. Can't wait for them to get dragged through the mud they deserve.

> **From user cliff47:** Preet Bharara is now officially my idol! This guy is like a tornado moving through political fraud.

(Exhibit L.)

Nearly every major and minor news outlet in the state ran stories following the arrest. A non-exhaustive sample of those stories is available in Exhibit M. Thereafter, Bharara repeated his playbook from the Silver and Skelos trials, by setting out on a preplanned public speaking tour. On October 6, 2016, he spoke at St. Rose College in Albany, New York at a panel titled "Bribery or Just Access to Elected Officials: Tawdry Tales of Ferraris, Rolexes and Ball Gowns". (Exhibit N.) He then sat down for a televised interview on *New York Now* where he addressed his office's investigation and prosecution of this matter. After being asked a question about whether this was the "golden age" of prosecution or the "dark age" of corruption, Bharara's answer included the following:

> I mean I think they understand how government works here and they understand what normal politics is. I mean people should remember we're not trying to criminalize ordinary politics we're trying to punish and hold accountable people who have violated their oath in a direct and concrete way and in an offensive way

> that violates the federal criminal statutes and so I think what happens is when you have a widespread problem like I think we have and prosecutors who have learned over time with experience both with their own investigators and with the FBI and other law enforcement agencies I think you have an intersection of two things. You have - you have great prosecutors and great work being done by folks in my office and our partners but also there's - there's stuff in the barrel to be shooting at and that's what they're doing.

(Exhibit O.)

Bharara's message here was clear: Public corruption is growing and with his infallible team, prosecuting these offenses (including the instant matter) is like shooting fish in a barrel.

It was amidst this steady media diet and the U. S. Attorney's public speaking tour that the Grand Jury considered and returned the indictment in this case, subsequently replaced by a Superseding Indictment.

The Government's conduct violates numerous ethical and regulatory provisions designed to protect the integrity of the criminal justice process, including the integrity of the Grand Jury. First, the Government violated Local Criminal Rule 23.1(b)'s prohibition against making public comments that "will interfere with a fair trial or otherwise prejudice the administration of justice." Second, the Government violated 28 C.F.R. § 50.2 (b)(2) by making public statements that "may reasonably be expected to influence the outcome of a pending or future trial." Third, the Government violated New York Rule of Professional Conduct which prohibits prosecutors from making comments to the press that have "a substantial likelihood of materially prejudicing an adjudicative proceeding." N.Y. R. Prof'l Conduct 3.6(a). Prejudicing Aiello and Gerardi is the only reason for the Government's well- coordinated effort. These efforts must be put to an end.

**B. Pretrial Prejudice as Standard Operating Procedure**

Papers filed in *Silver* already alerted this Court of the Government's pattern of misconduct in that case. *See* Defendant's Mot. to Dismiss, *United States v. Silver*, 1:15-cr-00093-VEC at 19-23 (S.D.N.Y. February 24, 2015), Dkt. No. 12. We incorporate the same by reference, in an effort to show how that pattern has continued. In addition to these examples, we request that the Court also review the allegations and findings in *Ganek v. Leibowitz, et al*, No. 15-CV-1446 (S.D.N.Y. filed May 20, 2016), where the Plaintiff is suing various federal officials including Bharara, for violating his civil rights, by among other things, prosecuting Mr. Ganek in the media without ever bringing a criminal charge against him and using false information to obtain search warrants. The Complaint is attached as Exhibit P. We also ask that the Court note the recent findings that a federal agent improperly leaked information to the media while the matter was under investigation by a federal Grand Jury in *United States v. Walters*, No. 16-CR-338 (PKC) (S.D.N.Y. filed May 16, 2016).

In *Silver*, as this court noted, the defendant could not point to a single authority where an indictment had been dismissed because of the prosecutorial conduct alleged in that case. *Silver*, 103 F. Supp. 3d at 380. The same remains true here. We cannot point the Court to any such authority. But that does not mean the Court is without such authority.

What we can point to is the obviously prejudicial manner in which the Government has prosecuted this case and other high profile cases that came before it in this District. So long as the Court decides that dismissal is not warranted unless there is a precedent, the line that protects all citizens and indeed, the defendants here, from the Government's misconduct will never be drawn. The consequence of which is that the Government will

continue to prejudice the accused. The time has come for the Court to draw that line and tell the Government that it has gone too far, even in the absence of conclusive evidence of "actual prejudice". *See United States v. Menendez*, Cr. No. 15-155, 2015 WL 5703236 (D.N.J. 2015). At the very least, the Court should inspect the Grand Jury minutes and poll the Grand Jury to determine the impact of the above prejudice since defendants have demonstrated a "particularized need" that outweighs the presumption of secrecy surrounding the Grand Jury process. *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978) (internal citations and quotations omitted). Without such relief, the Government will continue to execute its increasingly prejudicial tactics to the detriment of all.

## **FINAL MOTION**

Defendants join any and all motions that have been or will be made by co-defendants in this action that are applicable and are not inconsistent with their own motions, and move for permission to make further motions as counsel may deem appropriate in the future. They seek to associate themselves in particular with the challenges to the section 666 charges raised by Defendant Kelly, Defendant Percoco, and the Buffalo Defendants -- and relevant to the charges against them in Counts 3 and 14 -- as well as Defendant Kelly's arguments with respect to the infirmities of the honest services fraud counts.

We also specifically join the Buffalo Defendants arguments that the Superseding Indictment fails to allege that Howe was an agent of a governmental organization and Defendant Percoco's motion to dismiss for a similar infirmity in that Percoco was not a government agent and therefore could not have performed official acts between April 2014 and December 8, 2014, as alleged.

# **CONCLUSION**

For the foregoing reasons, the case against Aiello and Gerardi should be dismissed, and, if not, the Government should be required to provide a Bill of Particulars, and, should it fail to do so, the Superseding Indictment should be dismissed for duplicity. This Court should also sever the trials of Aiello and Gerardi from the trials of the Buffalo defendants and of Peter Gailbraith Kelly.

Dated: May 19, 2017
New York, NY

Respectfully submitted,


O'CONNEL & ARONOWITZ                    WALDEN MACHT & HARAN LLP

By: __/s Stephen R. Coffey__           By: _Milton L. Williams_____
    Stephen R. Coffey                       Milton L. Williams

    54 State Street                         One Battery Park Plaza
    Albany, NY 12207                        New York, NY 10004
    (518) 462-5601                          (212) 335-2041

    *Attorney for Defendant*                *Attorneys for Defendant*
    *Steven Aiello*                         *Joseph Gerardi*


By: __/s Scott W. Iseman__
    Scott W. Iseman

    54 State Street
    Albany, NY 12207
    (518) 462-5601

    *Attorney for Defendant*
    *Steven Aiello*